PLAYBOY ENTERPRISES, INC.,
a Delaware corporation,
Plaintiff–Appellant,

v.

Terri WELLES, an individual; Terri Welles, Inc., a California corporation; Stephen Huntington, an individual; Michael Mihalko, an individual; Pippi, Inc., a California corporation, Defendants–Appellees.

Playboy Enterprises, Inc., a Delaware corporation, Plaintiff–Appellee,

v.

Terri Welles, an individual; Terri Welles, Inc., a California corporation, Defendants–Appellants,

and

Stephen Huntington, an individual; Michael Mihalko, an individual; Pippi, Inc., a California corporation, Defendants.

Playboy Enterprises, Inc., a Delaware corporation, Plaintiff–Counter–Defendant–Appellee,

v.

Terri Welles, an individual; Terri Welles, Inc., a California corporation, Defendants–Counter–Claimants–Appellants,

and

Pippi, Inc., a California corporation, Defendant–Appellant.

Playboy Enterprises, Inc., a Delaware corporation, Plaintiff–Counter–Defendant–Appellee,

v.

Terri Welles, an individual, Defendant,

and

Michael Mihalko, an individual; Stephen Huntington, an individual, Defendants–Appellants.

Nos. 00–55009, 00–55229, 00–55537 and 00–55538.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 11, 2001

Filed Feb. 1, 2002.

Anthony Glassman, Glassman, Browning & Saltsman, Beverly Hills, California; Ronald M. Johnston, Blanc Williams Johnston & Kronstadt, LLP, Los Angeles, California; Barry G. Felder, Brown Raysman Millstein Felder & Steiner LLP, Los Angeles, California, for the plaintiff-appellant.

David J. Noonan, Post Kirby Noonan & Sweat LLP, San Diego, California; Jay S. Kopelowitz, Kopelowitz & Associates, San Diego, California; Darren J. Quinn, Law Offices of Darren J. Quinn, San Diego, California, for the defendants-appellees.

Before: B. FLETCHER, T.G. NELSON, and BERZON, Circuit Judges.

T.G. NELSON, Circuit Judge.

Playboy Enterprises, Inc. (PEI), appeals the district court's grant of summary judg-

ment as to its claims of trademark infringement, unfair competition, and breach of contract against Terri Welles; Terri Welles, Inc.; Pippi, Inc.; and Welles' current and former "webmasters," Steven Huntington and Michael Mihalko. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse in part.

In a separate memorandum disposition, we resolve Welles' cross-appeal of the district court's grant of summary judgment as to her counterclaims for defamation, intentional infliction of emotional distress, unfair competition, and interference with prospective economic advantage. Welles, Huntington and Mihalko also appeal the district court's denial of their requests for attorney's fees. We resolve that issue in the memorandum disposition as well.

## I.

### Background

Terri Welles was on the cover of Playboy in 1981 and was chosen to be the Playboy Playmate of the Year for 1981. Her use of the title "Playboy Playmate of the Year 1981," and her use of other trademarked terms on her website are at issue in this suit. During the relevant time period, Welles' website offered information about and free photos of Welles, advertised photos for sale, advertised memberships in her photo club, and promoted her services as a spokesperson. A biographical section described Welles' selection as Playmate of the Year in 1981 and her years modeling for PEI. After the lawsuit began, Welles included discussions of the suit and criticism of PEI on her website and included a note disclaiming any association with PEI.[1]

---

1. The disclaimer reads as follows: "This site is neither endorsed, nor sponsored, nor affili-

ated with Playboy Enterprises, Inc. PLAYBOY® PLAYMATE OF THE YEAR® AND

PEI complains of four different uses of its trademarked terms on Welles' website: (1) the terms "Playboy" and "Playmate" in the metatags of the website;[2] (2) the phrase "Playmate of the Year 1981" on the masthead of the website; (3) the phrases "Playboy Playmate of the Year 1981" and "Playmate of the Year 1981" on various banner ads, which may be transferred to other websites; and (4) the repeated use of the abbreviation "PMOY '81" as the watermark on the pages of the website.[3] PEI claimed that these uses of its marks constituted trademark infringement, dilution, false designation of origin, and unfair competition. The district court granted defendants' motion for summary judgment. PEI appeals the grant of summary judgment on its infringement and dilution claims. We affirm in part and reverse in part.

The district court also granted summary judgment on PEI's contract claims. Those claims arose from a contract between PEI and a corporation created by Welles, "Pippi, Inc." When Welles agreed to be Playmate of the Year in 1981, Pippi, Inc., signed a contract with PEI. The contract contained a term requiring prior written approval from PEI before Welles made any "non-Playboy use of her name with the designation 'Playmate of the Year.'" Pippi, Inc., was dissolved in 1984. PEI argues that Pippi, Inc., was Welles' alter ego and

that the terms of the contract are currently enforceable against Welles. The district court rejected this argument and granted summary judgment on PEI's contract claims in favor of Welles. We affirm.

## II.

### Standard of Review

■ We review the district court's grant of summary judgment de novo.[4] Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.[5] The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial.[6]

## III.

### Discussion

#### A. Trademark Infringement

Except for the use of PEI's protected terms in the wallpaper of Welles' website, we conclude that Welles' uses of PEI's trademarks are permissible, nominative uses. They imply no current sponsorship or endorsement by PEI. Instead, they serve to identify Welles as a past PEI "Playmate of the Year."[7]

---

PLAYMATE OF THE MONTH® are registered trademarks of Playboy Enterprises, Inc."

**2.** Metatags are hidden code used by some search engines to determine the content of websites in order to direct searchers to relevant sites.

**3.** PEI claims that "PMOY" is an unregistered trademark of PEI, standing for "Playmate of the Year."

**4.** *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000).

**5.** *Id.*

**6.** *Abdul–Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir.1996).

**7.** *See New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir.1992) (describing a nominative use as one that "does not imply sponsorship or endorsement of the product because the mark is used only to describe the thing, rather than to identify its source").

■ We articulated the test for a permissible, nominative use in *New Kids On The Block v. New America Publishing, Inc.*[8] The band, New Kids On The Block, claimed trademark infringement arising from the use of their trademarked name by several newspapers. The newspapers had conducted polls asking which member of the band New Kids On The Block was the best and most popular.[9] The papers' use of the trademarked term did not fall within the traditional fair use doctrine. Unlike a traditional fair use scenario, the defendant newspaper was using the trademarked term to describe not its own product, but the plaintiff's.[10] Thus, the factors used to evaluate fair use were inapplicable.[11] The use was nonetheless permissible, we concluded, based on its nominative nature.

■ We adopted the following test for nominative use:

First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.[12]

We noted in *New Kids* that a nominative use may also be a commercial one.[13]

■ In cases in which the defendant raises a nominative use defense, the above three-factor test should be applied instead of the test for likelihood of confusion set forth in *Sleekcraft*.[14] The three-factor test better evaluates the likelihood of confusion in nominative use cases. When a defendant uses a trademark nominally, the trademark will be identical to the plaintiff's mark, at least in terms of the words in question. Thus, application of the *Sleekcraft* test, which focuses on the similarity of the mark used by the plaintiff and the defendant, would lead to the incorrect conclusion that virtually all nominative uses are confusing. The three-factor test—with its requirements that the defendant use marks only when no descriptive substitute exists, use no more of the mark than necessary, and do nothing to suggest sponsorship or endorsement by the mark holder—better addresses concerns regarding the likelihood of confusion in nominative use cases.

We group the uses of PEI's trademarked terms into three for the purpose of applying the test for nominative use. First, we analyze Welles' use of the terms in headlines and banner advertisements. We conclude that those uses are clearly nominative. Second, we analyze the use of the terms in the metatags for Welles' website, which we conclude are nominative as well. Finally, we analyze the terms as used in the wall-paper of the website. We

---

8. 971 F.2d 302 (9th Cir.1992).

9. *Id.* at 304.

10. The "classic fair use case" is one in which "the defendant has used the plaintiff's mark to describe the defendant's *own* product." *Id.* at 308 (emphasis in original).

11. *See New Kids*, 971 F.2d at 308–09 (adopting a three-factor test for nominative use, not the eight-factor test for likelihood of confusion set forth in *AMF, Inc. v. Sleekcraft Boats*,

599 F.2d 341, 348–49 (9th Cir.1979), and applied in fair use cases).

12. *New Kids*, 971 F.2d at 308 (footnote omitted).

13. *Id.* at 309 ("Where, as here, the use does not imply sponsorship or endorsement, the fact that it is carried on for profit and in competition with the trademark holder's business is beside the point.").

14. 599 F.2d at 348–49.

conclude that this use is not nominative and remand for a determination of whether it infringes on a PEI trademark.

1. Headlines and banner advertisements.

To satisfy the first part of the test for nominative use, "the product or service in question must be one not readily identifiable without use of the trademark[.]" [15] This situation arises "when a trademark also describes a person, a place or an attribute of a product" [16] and there is no descriptive substitute for the trademark. In such a circumstance, allowing the trademark holder exclusive rights would allow the language to "be depleted in much the same way as if generic words were protectable." [17] In *New Kids*, we gave the example of the trademarked term, "Chicago Bulls." We explained that "one might refer to the 'two-time world champions' or 'the professional basketball team from Chicago,' but it's far simpler (and more likely to be understood) to refer to the Chicago Bulls." [18] Moreover, such a use of the trademark would "not imply sponsorship or endorsement of the product because the mark is used only to describe the thing, rather than to identify its source." [19] Thus, we concluded, such uses must be excepted from trademark infringement law.

The district court properly identified Welles' situation as one which must also be excepted. No descriptive substitute exists for PEI's trademarks in this context. The court explained:

[T]here is no other way that Ms. Welles can identify or describe herself and her services without venturing into absurd descriptive phrases. To describe herself as the "nude model selected by Mr. Hefner's magazine as its number-one prototypical woman for the year 1981" would be impractical as well as ineffectual in identifying Terri Welles to the public. [20]

We agree. Just as the newspapers in *New Kids* could only identify the band clearly by using its trademarked name, so can Welles only identify herself clearly by using PEI's trademarked title.

The second part of the nominative use test requires that "only so much of the mark or marks may be used as is reasonably necessary to identify the product or service[.]" [21] *New Kids* provided the following examples to explain this element: "[A] soft drink competitor would be entitled to compare its product to Coca–Cola or Coke, but would not be entitled to use Coca–Cola's distinctive lettering." [22] Similarly, in a past case, an auto shop was allowed to use the trademarked term "Volkswagen" on a sign describing the cars it repaired, in part because the shop "did not use Volkswagen's distinctive lettering style or color scheme, nor did he display the encircled 'VW' emblem." [23] Welles' banner advertisements and headlines satisfy this element because they use only the trademarked words, not the font or symbols associated with the trademarks.

15. *New Kids*, 971 F.2d at 308.

16. *Id.* at 306.

17. *Id.*

18. *Id.*

19. *Id.*

20. *PEI v. Welles*, 78 F.Supp.2d 1066, 1079 (S.D.Cal.1999).

21. *New Kids*, 971 F.2d at 308.

22. *Id.* at n. 7.

23. *Id.* (quoting *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir.1969)).

The third element requires that the user do "nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." [24] As to this element, we conclude that aside from the wallpaper, which we address separately, Welles does nothing in conjunction with her use of the marks to suggest sponsorship or endorsement by PEI. The marks are clearly used to describe the title she received from PEI in 1981, a title that helps describe who she is. It would be unreasonable to assume that the Chicago Bulls sponsored a website of Michael Jordan's simply because his name appeared with the appellation "former Chicago Bull." Similarly, in this case, it would be unreasonable to assume that PEI currently sponsors or endorses someone who describes herself as a "Playboy Playmate of the Year in 1981." The designation of the year, in our case, serves the same function as the "former" in our example. It shows that any sponsorship or endorsement occurred in the past. [25]

In addition to doing nothing in conjunction with her use of the marks to suggest sponsorship or endorsement by PEI, Welles affirmatively disavows any sponsorship or endorsement. Her site contains a clear statement disclaiming any connection to PEI. Moreover, the text of the site describes her ongoing legal battles with the company. [26]

For the foregoing reasons, we conclude that Welles' use of PEI's marks in her headlines and banner advertisements is a nominative use excepted from the law of trademark infringement.

## 2. Metatags.

■ Welles includes the terms "playboy" and "playmate" in her metatags. Metatags describe the contents of a website using keywords. Some search engines search metatags to identify websites relevant to a search. [27] Thus, when an internet searcher enters "playboy" or "playmate" into a search engine that uses metatags, the results will include Welles' site. [28] Because Welles' metatags do not repeat the terms extensively, her site will not be at the top of the list of search results. Applying the three-factor test for nominative use, we conclude that the use of the trademarked terms in Welles' metatags is nominative.

As we discussed above with regard to the headlines and banner advertisements, Welles has no practical way of describing herself without using trademarked terms. In the context of metatags, we conclude that she has no practical way of identifying the content of her website without referring to PEI's trademarks.

A large portion of Welles' website discusses her association with Playboy over the years. Thus, the trademarked terms accurately describe the contents of Welles' website, in addition to describing Welles. Forcing Welles and others to use absurd turns of phrase in their metatags, such as

---

24. *Id.* at 308.

25. We express no opinion regarding whether an individual's use of a current title would suggest sponsorship or endorsement.

26. By noting Welles' affirmative actions, we do not mean to imply that affirmative actions of this type are necessary to establish nominative use. *New Kids* sets forth no such requirement, and we do not impose one here.

27. *See Brookfield Communications, Inc. v. West Coast Entertainment*, 174 F.3d 1036, 1045 (9th Cir.1999).

28. We note that search engines that use their own summaries of websites, or that search the entire text of sites, are also likely to identify Welles' site as relevant to a search for "playboy" or "playmate," given the content of the site.

those necessary to identify Welles, would be particularly damaging in the internet search context. Searchers would have a much more difficult time locating relevant websites if they could do so only by correctly guessing the long phrases necessary to substitute for trademarks. We can hardly expect someone searching for Welles' site to imagine the same phrase proposed by the district court to describe Welles without referring to Playboy—"the nude model selected by Mr. Hefner's organization. . . ." Yet if someone could not remember her name, that is what they would have to do. Similarly, someone searching for critiques of Playboy on the internet would have a difficult time if internet sites could not list the object of their critique in their metatags.

There is simply no descriptive substitute for the trademarks used in Welles' metatags. Precluding their use would have the unwanted effect of hindering the free flow of information on the internet, something which is certainly not a goal of trademark law.[29] Accordingly, the use of trademarked terms in the metatags meets the first part of the test for nominative use.

We conclude that the metatags satisfy the second and third elements of the test as well. The metatags use *only so much of* the marks as reasonably necessary [30] and nothing is done in conjunction with them to suggest sponsorship or endorsement by the trademark holder. We note that our decision might differ if the metatags listed the trademarked term so repeatedly that Welles' site would regularly appear above PEI's in searches for one of the trademarked terms.[31]

### 3. Wallpaper/watermark.

■ The background, or wallpaper, of Welles' site consists of the repeated abbreviation "PMOY '81," which stands for "Playmate of the Year 1981."[32] Welles' name or likeness does not appear before or after "PMOY '81." The pattern created by the repeated abbreviation appears as the background of the various pages of the website. Accepting, for the purposes of this appeal, that the abbreviation "PMOY" is indeed entitled to protection, we conclude that the repeated, stylized use of this abbreviation fails the nominative use test.

The repeated depiction of "PMOY '81" is not necessary to describe Welles. "Playboy Playmate of the Year 1981" is quite adequate. Moreover, the term does not even appear to describe Welles—her name or likeness do not appear before or after each "PMOY '81." Because the use of the abbreviation fails the first prong of the nominative use test, we need not apply the next two prongs of the test.

---

**29.** Admittedly, this hindrance would only occur as to search engines that use metatags to direct their searches.

**30.** It is hard to imagine how a metatag could use more of a mark than the words contained in it, but we recently learned that some search engines are now using pictures. Searching for symbols, such as the Playboy bunny, cannot be far behind. That problem does not arise in this case, however, and we need not address it.

**31.** PEI asserts that it introduced evidence showing that Welles' site has been listed be-

fore PEI's on occasion. However, an examination of the evidence PEI cites shows that Welles' site, although sometimes ranked highly, was still listed below PEI's in search results.

**32.** "PMOY" is not itself registered as a trademark. PEI argued before the district court that it is nonetheless protected because it is a well-known abbreviation for the trademarked term "Playmate of the Year." In this court PEI cites one affidavit that supports this argument.

Because the defense of nominative use fails here, and we have already determined that the doctrine of fair use does not apply, we remand to the district court. The court must determine whether trademark law protects the abbreviation "PMOY," as used in the wallpaper.

## B. Trademark Dilution

 The district court granted summary judgment to Welles as to PEI's claim of trademark dilution. We affirm on the ground that all of Welles' uses of PEI's marks, with the exception of the use in the wallpaper which we address separately, are proper, nominative uses. We hold that nominative uses, by definition, do not dilute the trademarks.

 Federal law provides protection against trademark dilution:

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.... [33]

Dilution, which was not defined by the statute, has been described by the courts as "the gradual 'whittling away' of a trademark's value." [34] Traditionally, courts have recognized two forms of dilution: blurring and tarnishment. Blurring occurs when another's use of a mark creates "the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." [35] Tarnishment, on the other hand, occurs "when a famous mark is improperly associated with an inferior or offensive product or service." [36] As we recognized in *Panavision*, dilution may occur through uses on the internet as well as elsewhere. [37]

 Dilution works its harm not by causing confusion in consumers' minds regarding the source of a good or service, but by creating an association in consumers' minds between a mark and a different good or service. [38] As explained in a First Circuit case, in dilution (as compared to infringement) "an entirely different issue is at stake—not interference with the source signaling function but rather protection from an appropriation of or free riding on the investment [the trademark holder] has made in its [trademark]." [39] Thus, for example, if a cocoa maker began using the "Rolls Royce" mark to identify its hot chocolate, no consumer confusion would be likely to result. Few would assume that the car company had expanded into the cocoa making business. However, the cocoa maker would be capitalizing on the investment the car company had made in its mark. Consumers readily associate the mark with highly priced automobiles of a certain quality. By identifying the cocoa with the Rolls Royce mark, the producer would be capitalizing on consumers' association of the mark with high quality items. Moreover, by labeling a different product "Rolls Royce," the cocoa company would

**33.** 15 U.S.C. § 1125(c)(1).

**34.** *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir.1991) (*citing* J. McCarthy, *Trademarks and Unfair Competition*, § 24:13 (2d ed.1984)).

**35.** *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1326 n. 7 (9th Cir.1998).

**36.** *Id.*

**37.** *Id.* at 1326–27.

**38.** *See* 4 J. McCarthy, *Trademarks and Unfair Competition*, § 24:70 (4th ed.2001).

**39.** *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 50 (1st Cir.1998).

be reducing the ability of the mark to identify the mark holder's product. If someone said, "I'm going to get a Rolls Royce," others could no longer be sure the person was planning on buying an expensive automobile. The person might just be planning on buying a cup of cocoa. Thus, the use of the mark to identify the hot chocolate, although not causing consumer confusion, would cause harm by diluting the mark.

■ Uses that do not create an improper association between a mark and a new product but merely identify the trademark holder's products should be excepted from the reach of the anti-dilution statute. Such uses cause no harm. The anti-dilution statute recognizes this principle and specifically excepts users of a trademark who compare their product in "commercial advertising or promotion to identify the competing goods or services of the owner of the famous mark." [40]

■ For the same reason uses in comparative advertising are excepted from anti-dilution law, we conclude that nominative uses are also excepted. A nominative use, by definition, refers to the trademark holder's product. It does not create an improper association in consumers' minds between a new product and the trademark holder's mark.

When Welles refers to her title, she is in effect referring to a product of PEI's. She does not dilute the title by truthfully identifying herself as its one-time recipient any more than Michael Jordan would dilute the name "Chicago Bulls" by referring to himself as a former member of that team, or

the two-time winner of an Academy Award would dilute the award by referring to him or herself as a "two-time Academy Award winner." Awards are not diminished or diluted by the fact that they have been awarded in the past. Similarly, they are not diminished or diluted when past recipients truthfully identify themselves as such. It is in the nature of honors and awards to be identified with the people who receive them. Of course, the conferrer of such honors and awards is free to limit the honoree's use of the title or references to the award by contract. So long as a use is nominative, however, trademark law is unavailing.

■ The one exception to the above analysis in this case is Welles' use of the abbreviation "PMOY" on her wallpaper. Because we determined that this use is not nominative, it is not excepted from the anti-dilution provisions. Thus, we reverse as to this issue and remand for further proceedings. We note that if the district court determines that "PMOY" is not entitled to trademark protection, PEI's claim for dilution must fail. The trademarked term, "Playmate of the Year" is not identical or nearly identical to the term "PMOY." Therefore, use of the term "PMOY" cannot, as a matter of law, dilute the trademark "Playmate of the Year." [41]

### C. Contract

■ The district court granted summary judgment against PEI on its contract claims. We affirm. Although we conclude that PEI advanced sufficient evidence to establish unity of interest, the first prong of the alter ego test,[42] we agree with the

---

**40.** 15 U.S.C. § 1125(c)(4)(A).

**41.** See Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 832 (8th Cir.1999) (holding that marks must be "similar enough that a significant segment of the target group of customers sees the two marks as essentially the same");

J. McCarthy, McCarthy on Trademarks and Unfair Competition, § 24:90.2 (4th ed.2001).

**42.** Roman Catholic Archbishop of San Francisco v. The Superior Court of Alameda Coun-

district court that PEI advanced insufficient evidence to defeat summary judgment on the second prong. PEI did not show that "the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice."[43] We note that the alter ego rule is generally applied with caution.[44] The district court did not err by declining to apply it here.

## IV.

### Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment as to PEI's claims for trademark infringement and trademark dilution, with the sole exception of the use of the abbreviation "PMOY." We reverse as to the abbreviation and remand for consideration of whether it merits protection under either an infringement or a dilution theory. We also affirm as to PEI's claims for breach of contract. In a separate memorandum disposition, we resolve the issues raised by Welles' cross-appeal.

AFFIRMED in part, REVERSED and REMANDED in part. Costs to Terri Welles and Terri Welles, Inc.

---

*ty,* 15 Cal.App.3d 405, 411, 93 Cal.Rptr. 338 (1971).

**43.** *Id.* (quoting *Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal.App.2d 825, 837, 26 Cal.Rptr. 806 (1962)).

**44.** *See* William M. Fletcher, FLETCHER CYCLOPEDIA OF CORPORATIONS § 41.10 (perm. ed.2000).